UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
Waco Division

| | |
|---|---|
| JASMIN HERNANDEZ;<br><br>Plaintiff,<br><br>v.<br><br>BAYLOR UNIVERSITY BOARD OF REGENTS; ART BRILES, in his official capacity as head football coach; IAN MCCAW, in his official capacity as athletic director;<br><br>Defendants. | §§§§§§§§§§§§§§§§§§§§§§§<br><br>Case No.: 6:16-CV-00069 |

COMPLAINT AND JURY DEMAND

Plaintiff, through her attorneys, submits this Complaint and states the following:

PARTIES AND JURISDICTION

1. Defendant Baylor University Board of Regents ("Regents") is the official governing body of Baylor University ("Baylor") and is charged with operating and governing Baylor, a private university located in Waco, Texas.

2. Defendant Art Briles ("Briles") is, and was at all times relevant, the head football coach at Baylor. Briles is responsible for overseeing all football related activities, and has the authority to discipline any and all Baylor football players. As head football coach, Briles is an agent of Baylor.

3. Defendant Ian McCaw is, and was at all times relevant, Baylor's athletic director. McCaw is responsible for overseeing all of Baylor's athletic programs, including Baylor's football team. Based on information and belief, McCaw has the authority to discipline any and all Baylor coaches, as well as any and all Baylor student-athletes. As

1

athletic director, McCaw is an agent of Baylor.

4. Plaintiff Jasmin Hernandez ("Hernandez") was, at all times relevant, a student at Baylor.

5. Baylor receives federal financial assistance and is therefore subject to the dictates of 20 U.S.C. § 1681. ("Title IX")

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and over state law claims pursuant to 28 U.S.C. § 1367.

7. Venue in this Court is proper under 28 U.S.C. § 1391 (b) because the events giving rise to this claim took place in this judicial district, and Defendants reside in this judicial district.

## BACKGROUND FACTS RELEVANT TO ALL COUNTS
### The Dear Colleague Letter

8. The Office of Civil Rights ("OCR"), a division of the United States Department of Education ("DOE"), is responsible for the implementation, interpretation, and enforcement of Title IX.

9. The OCR has promulgated numerous documents outlining the requirements for an educational institution to be in compliance with Title IX, including the Dear Colleague Letter of April 4th, 2011 ("DCL"), which specifically concerns peer-on-peer sexual harassment and sexual assault.

10. The DOE was authorized by Congress, pursuant to 20 U.S.C.A. § 1682, to promulgate regulations to govern the implementation, interpretation and enforcement of Title IX.

11. The DCL is a "significant guidance document," intended to provide educational institutions with clarity as to the requirements they must follow in order to be in compliance with the DOE.  Pursuant to 72 Fed. Reg. 3432, a "guidance document" is "an agency statement of general applicability and future effect, other than a regulatory action…that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory or regulatory issue."  A "significant guidance document" is "a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to… (iv) Raise novel legal or policy issues arising out of legal

mandates, the President's priorities, or the principles set forth in Executive Order 12866, as further amended."

12. The DCL specifically outlines the requirements that educational institutions must follow regarding peer-on-peer sexual harassment and assault.

13. A failure to adhere to the requirements outlined in the DCL could result in the loss of federal funding for an educational institution.

14. The DCL states that "School's are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures."

15. The DCL also requires that school "employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly."

16. The DCL requires that a school identify the name, title and contact information of the person designated to coordinate the school's compliance with Title IX. This coordinator is responsible for overseeing all Title IX complaints. This coordinator should not have any other job responsibilities that may create a conflict of interest. Further, the school must ensure that this coordinator has adequate training on Title IX.

17. The DCL also notes that "If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures." In other words, a school is responsible for processing complaints of student-on-student harassment or assault, even if it occurs off campus, because "students often experience the continuing effects of off-campus conduct in the educational setting…"

18. Further, the DCL states that a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate a claim of assault.

19. The DCL states, Title IX requires that the school's inquiry into peer-on-peer sexual harassment and assault "must be prompt, thorough, and impartial."

20. The DCL requires the school to "tell the complainant that Title IX prohibits retaliation,

and that school officials will not only take steps to prevent retaliation but also strong responsive action if it occurs."

21. As to any potential conflicts of interest, The DCL states, "a school's investigation and hearings processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed."

22. The DCL requires designated and reasonably prompt timeframes for investigation and resolution. Per the DCL, "Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint."

23. In addition to resolving complaints promptly, the DCL also addresses OCR recommendations regarding the use of preventive education programs and comprehensive victim services. Per the DCL, such education and training may be included in "orientation programs for new students, faculty, staff, and employees."

24. The DCL also outlines OCR recommendations regarding complainant safety. The DCL states, "Title IX requires a school take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should take these steps promptly once it has notice of a sexual harassment or violence allegation." The DCL continues, "When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain."

25. The DCL specifically addresses retaliation, stating, "Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment."

**Background Facts Relevant To Baylor's Sexual Misconduct Policies and Procedures**

26. Despite the DOE's multiple guidance documents, during the relevant time frame alleged herein, Baylor did not have a Title IX coordinator. Instead, reports of sexual harassment and sexual assault were handled by Baylor's Chief Judicial Officer, Bethany McCraw.

27. Based on information and belief, prior to Plaintiff's sexual assault alleged herein, one female student, Jane Roe and her mother met with McCraw to report that she had been sexually assaulted by Tevin Elliott ("Elliott"), a student-athlete on Baylor's football team.

28. At this meeting, McCraw informed Roe that there was nothing McCraw could do in response to Roe's complaint that she had been raped by Elliott. McCraw also told Roe and her mother that Roe was the sixth female student to come in to McCraw's office to report that they had been sexually assaulted by Elliott. Roe and her mother asked if Briles knew of these reports, to which McCraw responded that Briles was aware of the reports. McCraw told Roe and her mother that there was nothing the school could do for Roe unless there was a court determination that Elliott had indeed raped Roe. Otherwise, McCraw said, it would come down to a "he said-she said" situation, and the school could not act on it.

29. Roe and her mother asked McCraw about filing for a restraining order. McCraw responded that all she could do was send a letter to Elliott informing him that he was not to come near Roe, and "then you kind of hope for the best."

30. Based on information and belief, Baylor, Briles and McCaw were aware that in November of 2011, Elliott had been cited for misdemeanor sexual assault, stemming from allegations that he had trapped a community college student in her room, held her against her will, and touched her inappropriately.

31. One former member of Baylor's advisory board that reviewed sexual assault response issues with community leaders has publicly stated that Baylor officials have known about the larger problem of sexual assaults committed by student-athletes for several years.

32. This former member is also a Sexual Assault Nurse Examiner ("SANE") for the Waco area, meaning she is the first person most assault victims talk to when they check themselves in to a hospital after being sexually assaulted. In that capacity, this SANE nurse has estimated that despite only making up 4% of the student population at Baylor, male student-athletes are responsible for 25%-50% of all reported assaults that occur at Baylor.

**Background Facts Related To Plaintiff Jasmin Hernandez**

33. Hernandez enrolled at Baylor in the Fall of 2011.
34. Hernandez had earned an academic scholarship to enroll in Baylor's undergraduate nursing program.
35. On April 15, 2012, Hernandez was attending a party at a residence near campus with some friends. The group of friends was invited to the party by Elliott, as he knew one of Hernandez's friends. At one point in the night, Hernandez and a friend went to look for a restroom. While moving through the residence, Hernandez and her friend got separated. Elliott approached Hernandez, grabbed her by the wrist and led her outside. Hernandez consistently protested that she wanted to go back into the house, but Elliott ignored her. As Hernandez's protestations intensified, Elliott picked Hernandez up over his shoulder and carried her behind a secluded shack on the property. There, Elliott pushed Hernandez up against an embankment, ripped off her pants and began to rape her. Hernandez managed to pull her pants back up, and in a daze, attempted to find her way back into the house. Instead, Elliott grabbed Hernandez again, pulled her pants back down and began raping her again. When he was finished, he allowed Hernandez to put her clothes back on and go.
36. Hernandez stumbled back into the party and found her friends. She informed them what had happened, and they immediately drove Hernandez to the nearest hospital where a rape kit was performed.
37. While at the hospital, Hernandez also gave her account of what happened to a Waco

Police Department officer.

38. The next day, Hernandez called her mother ("Mother") to inform her what had happened. Mother flew out to Waco the very next day.

39. Upon arriving in Waco, Mother immediately called the Baylor Counseling Center to inform them that her daughter had just been raped, and to request that her daughter be given mental health services to help mitigate the effects of such a traumatic event. The Counseling Center informed Mother that they were too busy, and could not see Hernandez.

40. Next, Mother called the psychology department at Baylor's Student Health Center to request services for her daughter. The Student Health Center informed Mother that all counseling sessions were full, and they could not provide any services to Hernandez.

41. A few days later, Mother called Baylor's Academic Services Department to request academic accommodations for her daughter, who was still traumatized from being raped and would not be able to fully concentrate on her studies for some time. The Academic Services Department refused to provide any accommodations, telling Mother that even "if a plane falls on your daughter, there's nothing we can do to help you."

42. Mother also called Briles to inform him about what Elliott, one of Briles' football players had done. Mother received a return phone call from Briles' secretary informing Mother that her office had heard of the allegations and were looking into it.

43. Hernandez's father also called Briles' office several times to follow up. Hernandez's father never received a return phone call from Briles or anyone in his office.

44. Despite Hernandez's multiple reports to several administrative offices that she had been raped by another Baylor student, Baylor did not take any action whatsoever to investigate Hernandez's claim.

45. Despite having been accused of raping Hernandez, Elliott was allowed to remain on campus, completely unrestricted, for several months until he ultimately transferred during the summer of 2012. Elliott's mere presence on campus subjected Hernandez to

additional harassment, by making her vulnerable to an encounter with Elliott, the man that raped her, at any time and at any place on campus.

46. Based on information and belief, Defendant failed to properly train and educate their employees, including school officials, officers, investigators, and adjudicators in appropriate response to allegations of sexual harassment, sexual abuse, and retaliatory conduct, as well as necessary Title IX policies and procedures.

47. Defendant failed to adequately educate Baylor students, including but not limited to Elliott, on the dangers of sexual harassment, assault and retaliatory conduct, including but not limited to the impact of such conduct on victims.

48. During the relevant time period, Defendant failed to comply with Title IX by failing to have a dedicated Title IX coordinator. Defendant only hired a full-time, dedicated Title IX coordinator in 2014, several years after Hernandez's rape.

49. These failures, and others, amounted to an intentional violation of Title IX by Defendant.

50. Defendants also acted with deliberate indifference towards Hernandez's reports of rape to several different Baylor departments as reflected by Defendants' actions and inaction alleged herein.

51. Defendant Baylor, in violation of 34 C.F.R. § 106.8, failed to provide a designate Title IX coordinator to whom Plaintiff would have been able to report her complaint of sexual assault by a fellow student. Moreover, Defendant Baylor intentionally violated Title IX by misinforming and misleading Plaintiff that she had no recourse at Defendant University for remedying and responding to her complaints of sexual assault by Elliott or of the availability of accommodation she was entitled to by law.

52. Based upon information and belief, Plaintiff alleges that Defendant Baylor at the time of Plaintiff's reports of sexual assault by Elliot, was in violation of Title IX's requirement that the University have a clear, widely available, and easily accessible non-gender discrimination policy and/or sexual misconduct policy advising students, including Plaintiff, of their rights and remedies in the event that they are sexually assaulted or

harassed by a fellow student or employee of the University.

53. Based upon information and belief, Plaintiff alleges that Defendant Baylor did not conduct mandatory educational sessions or programs regarding the topics of alcohol abuse, sexual misconduct and or student rights and remedies under state and federal law as required by the OCR. If in fact Defendant University did provide any such educational sessions or programs, they failed to insure that such programs or sessions were attended by Baylor students, including student athletes.

54. Plaintiff was not otherwise aware of her Title IX remedies at the time she made reports to University authorities of the sexual assault by Elliott.

55. As a result of Defendants' actions and inaction in response to Hernandez's report of rape by Elliott, and as a result of her ongoing fear of encountering Elliott, her rapist, on campus, Hernandez was deprived of a multitude of educational opportunities and/or benefits, including but not limited to:

- A significant drop in her grades;
- Being placed on academic probation as a result of her drop in grades;
- Avoidance of social activities on campus;
- Avoidance of certain areas of campus;
- A loss of her academic scholarship that she had earned to attend Baylor;
- Withdrawal from Baylor altogether.

**FIRST CAUSE OF ACTION**
**DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF 20 U.S.C. § 1681**
**(TITLE IX)**
**(AGAINST DEFENDANT REGENTS)**

56. Plaintiff incorporates all paragraphs of this Complaint is if fully set forth herein.

57. Regents' acts and failures to act perpetrated against Plaintiff amounted to unlawful sexual harassment and discrimination on the basis of gender. The harassment and discrimination was sufficiently severe and pervasive to create an abusive, and hostile

educational environment for Plaintiff. One or more Baylor administrators or officials, with authority to take corrective action on Plaintiff's behalf, had actual notice of said harassment and discrimination and failed to adequately respond, in violation of their own policies. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur. As a result, Plaintiff was subject to continuing harassment and a loss of educational opportunity.

58. Additionally, and/or in the alternative, Regents failed to enact and/or disseminate and/or implement proper or adequate procedures to discover, prohibit or remedy the kind of discrimination that Plaintiff suffered. This failure included, without limitation, non-existent or inadequate customs, policies or procedures for the recognition, reporting, investigation and correction of unlawful discrimination, and the failure to properly vet recruited student-athletes such as Elliott. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur. As a result, Plaintiff was subject to continuing harassment and a loss of educational opportunity.

59. Regents acted with deliberate indifference in deviating significantly from the standard of care outlined by the DOE in the Dear Colleague Letter of 2011 and Regents' own policies.

60. As a result of Regents' deliberate indifference, Plaintiff suffered loss of educational opportunities and/or benefits and has and will continue to incur attorney fees and costs of litigation.

## SECOND CAUSE OF ACTION
## NEGLIGENCE
## (AGAINST ALL DEFENDANTS)

61. Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.
62. At all times relevant, Defendants had a duty to take reasonable measures to protect

Plaintiff as a student at Defendants' institution, because they knew that Elliott had sexually assaulted at least six women, including other Baylor students. Thus, Defendants were aware of the need to control Elliott, and had the ability to control Elliott. Defendants also had a duty to take reasonable protective measures to protect Plaintiff and other similarly situated students from the risk of sexual abuse and/or sexual assault, such as the duty to properly warn, train or educate Plaintiff and other students about how to avoid such a risk. This created a special relationship between Defendants and Plaintiff who was entrusted to Defendants' care. Defendants voluntarily accepted the entrusted care of Plaintiff. As such, Defendants owed Plaintiff a duty of care.

63. Defendants, by and through their agents, servants and employees, knew or reasonably should have known of Elliott's dangerous and exploitive propensities, as a result of prior reports of sexual assault by Elliott, and the prevalence of sexual assault and retaliatory conduct against reporters of sexual assault at Baylor and other universities and/or institutions of higher learning. With this knowledge, it was foreseeable that if Defendants did not adequately exercise or provide the duty of care owed to students, including but not limited to Plaintiff, female students would be vulnerable to sexual assault and retaliatory conduct by Elliott and others.

64. Defendants, by and through their agents, servants and employees, were acting within the course and scope of their employment at all times relevant and breached their duty of care to Plaintiff by deviating significantly from the standard of care outlined by the DOE in the Dear Colleague Letter of 2011.

65. Defendant Briles and Defendant McCaw breached their duty of care by engaging in conduct including, but not limited to:
    - Failing to properly train and/or educate student-athlete members of the Baylor football team regarding sexual misconduct;
    - Failing to appropriately monitor to ensure that student athletes are not brought on to campus without regard to the safety of other students;

- Failing to implement safeguards for female students adequate to protect them from foreseeable criminal and anti-social activities by student-athlete members of the football team;
- Failing to supervise faculty and staff to ensure proper supervision, control, restraint and monitoring of student athletes; and
- Failing to monitor or supervise Elliott, despite their knowledge that he had sexually assaulted multiple female students prior to sexually assaulting Plaintiff.

66. Defendant Regents breached their duty of care by engaging in conduct including, but not limited to:

- Failing to assure adequate staff training to meet the behavior and social needs of all individuals, including sexual assault victims;
- Failing to implement a system to screen prospective faculty and staff training history;
- Failing to supervise faculty and staff to ensure proper supervision, control, restraint and monitoring of student athletes;
- Failing to properly train faculty and staff to screen the backgrounds (criminal and social) of student athletes that are recruited to play sports at the University;
- Failing to properly train and/or educate the faculty and staff responsible for caring for recruiting student athletes with criminal and anti-social backgrounds;
- Failing to appropriately monitor to ensure that student athletes are not brought on to campus without regard to the safety of other students;
- Failing to implement safeguards for female students adequate to protect them from foreseeable criminal and anti-social activities;
- Failing to provide supervision and training in administration of counseling of rape victims following an attack (to wit: having a counselor encourage a victim to refrain from reporting her attack); and
- Ratifying the sexual misconduct of student athletes by University officials by

      failing to discourage such behavior in prior instances.

67. But for the intentional and negligent acts and omissions of Defendants and their violations of the standards of care and statute set forth herein, Plaintiff would not have been injured. Defendants' intentional and negligent acts and omissions therefore amount to negligence, negligent failure to warn, train and/or educate, and negligence per se.

68. As a result of the above-described conduct, Plaintiff has suffered, and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays for damages; punitive damages; costs; interest; statutory/civil penalties according to law; attorneys' fees and costs of litigation, pursuant to 42 U.S.C. §1988 or other applicable law; and such other relief as the court deems appropriate and just.

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS

Dated: March 30, 2016            Respectfully submitted,

                                           /s/ Susan Hutchison
                                           Susan Hutchison (#10354100)
                                           hutch@hsjustice.com
                                           HUTCHISON & STOY PLLC
                                           509 Pecan Street, Suite 201
                                           Fort Worth TX  76102
                                           Telephone: (817) 820-0100
                                           Facsimile: (817) 820-0111

Alexander S. Zalkin *(pending pro hac vice)*
alex@zalkin.com
Ryan M. Cohen *(pending pro hac vice)*
ryan@zalkin.com
THE ZALKIN LAW FIRM, P.C.
12555 High Bluff Drive, Ste. 301
San Diego CA  92130
Telephone: (858) 259-3011
Facsimile: (858) 259-3015

*Attorneys for Plaintiff Jasmin Hernandez*

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 30, 2016, I electronically filed the foregoing paper with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter.

      /s/ Susan Hutchison
      Susan Hutchison (#10354100)
      hutch@hsjustice.com
      HUTCHISON & STOY PLLC
      509 Pecan Street, Suite 201
      Fort Worth TX  76102
      Telephone: (817) 820-0100
      Facsimile: (817) 820-0111

Dated: March 30, 2016