## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### Waco Division

| | |
|---|---|
| JASMIN HERNANDEZ; | § |
| | § |
| Plaintiff, | § |
| | § |
| | § Case No.: 6:16-CV-00069 |
| | § |
| v. | § |
| | § |
| BAYLOR UNIVERSITY; ART BRILES, | § |
| in his individual capacity; IAN MCCAW, | § |
| in his individual capacity; | § |
| | § |
| Defendants. | § |
| | § |
| | § |
| | § |
| | § |

### SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, through her attorneys, submits this Second Amended Complaint and states the following:

### PARTIES AND JURISDICTION

1. Defendant Baylor University ("Baylor") is a private university located in Waco, Texas. Baylor is governed and operated by the Baylor University Board of Regents ("Regents").

2. Defendant Art Briles ("Briles") was, at all times relevant, the head football coach at Baylor. Briles was responsible for overseeing all football related activities, and had the authority to discipline any and all Baylor football players. As head football coach, Briles was an agent of Baylor. Briles is named here in his individual capacity.

3. Defendant Ian McCaw was, at all times relevant, Baylor's athletic director. McCaw was responsible for overseeing all of Baylor's athletic programs, including Baylor's football team. Based on information and belief, McCaw had the authority to discipline any and all Baylor coaches, as well as any and all Baylor student-athletes. As athletic director, McCaw was an agent of Baylor. McCaw is named here in his individual capacity.

1

4. Plaintiff Jasmin Hernandez ("Hernandez") was, at all times relevant, a student at Baylor.

5. Baylor receives federal financial assistance and is therefore subject to the dictates of 20 U.S.C. § 1681. ("Title IX")

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and over state law claims pursuant to 28 U.S.C. § 1367.

7. Venue in this Court is proper under 28 U.S.C. § 1391 (b) because the events giving rise to this claim took place in this judicial district, and Defendants reside in this judicial district.

## BACKGROUND FACTS RELEVANT TO ALL COUNTS
### The Dear Colleague Letter

8. The Office of Civil Rights ("OCR"), a division of the United States Department of Education ("DOE"), is responsible for the implementation, interpretation, and enforcement of Title IX.

9. The OCR has promulgated numerous documents outlining the requirements for an educational institution to be in compliance with Title IX, including the Dear Colleague Letter of April 4, 2011 ("DCL"), which specifically concerns peer-on-peer sexual harassment and sexual assault.

10. The DOE was authorized by Congress, pursuant to 20 U.S.C.A. § 1682, to promulgate regulations to govern the implementation, interpretation and enforcement of Title IX.

11. The DCL is a "significant guidance document," intended to provide educational institutions with clarity as to the requirements they must follow in order to be in compliance with the DOE. Pursuant to 72 Fed. Reg. 3432, a "guidance document" is "an agency statement of general applicability and future effect, other than a regulatory action…that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory or regulatory issue." A "significant guidance document" is "a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to… (iv) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in Executive Order 12866,

as further amended."

12. The DCL specifically outlines the requirements that educational institutions must follow regarding peer-on-peer sexual harassment and assault.

13. A failure to adhere to the requirements outlined in the DCL could result in the loss of federal funding for an educational institution.

14. The DCL states that "School's are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures."

15. The DCL also requires that school "employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly."

16. The DCL requires that a school identify the name, title and contact information of the person designated to coordinate the school's compliance with Title IX.  This coordinator is responsible for overseeing all Title IX complaints.  This coordinator should not have any other job responsibilities that may create a conflict of interest.  Further, the school must ensure that this coordinator has adequate training on Title IX.

17. The DCL also notes that "If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures."   In other words, a school is responsible for processing complaints of student-on-student harassment or assault, even if it occurs off campus, because "students often experience the continuing effects of off-campus conduct in the educational setting…"

18. Further, the DCL states that a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate a claim of assault.

19. The DCL states, Title IX requires that the school's inquiry into peer-on-peer sexual harassment and assault "must be prompt, thorough, and impartial."

20. The DCL requires the school to "tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also strong

responsive action if it occurs."

21. As to any potential conflicts of interest, The DCL states, "a school's investigation and hearings processes cannot be equitable unless they are impartial.  Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed."

22. The DCL requires designated and reasonably prompt timeframes for investigation and resolution.  Per the DCL, "Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint."

23. In addition to resolving complaints promptly, the DCL also addresses OCR recommendations regarding the use of preventive education programs and comprehensive victim services.  Per the DCL, such education and training may be included in "orientation programs for new students, faculty, staff, and employees."

24. The DCL also outlines OCR recommendations regarding complainant safety.  The DCL states, "Title IX requires a school take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation.  The school should take these steps promptly once it has notice of a sexual harassment or violence allegation."  The DCL continues, "When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain."

25. The DCL specifically addresses retaliation, stating, "Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates.  For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting.  As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment."

## Background Facts Relevant To Baylor's Sexual Misconduct Policies and Procedures

26. Despite the DOE's multiple guidance documents, during the relevant time frame alleged herein, Baylor did not have a Title IX coordinator.  Instead, reports of sexual harassment and sexual assault were handled by Baylor's Chief Judicial Officer, Bethany McCraw.

27. Based on information and belief, prior to Plaintiff's sexual assault alleged herein, one female student, Jane Roe and her mother met with McCraw to report that she had been sexually assaulted by Tevin Elliott ("Elliott"), a student-athlete on Baylor's football team.

28. At this meeting, McCraw informed Roe that there was nothing McCraw could do in response to Roe's complaint that she had been raped by Elliott.  McCraw also told Roe and her mother that Roe was the sixth female student to come in to McCraw's office to report that they had been sexually assaulted by Elliott.  Roe and her mother asked if Briles knew of these reports, to which McCraw responded that Briles was aware of the reports.  McCraw told Roe and her mother that there was nothing the school could do for Roe unless there was a court determination that Elliott had indeed raped Roe.  Otherwise, McCraw said, it would come down to a "he said-she said" situation, and the school could not act on it.

29. Roe and her mother asked McCraw about filing for a restraining order.  McCraw responded that all she could do was send a letter to Elliott informing him that he was not to come near Roe, and "then you kind of hope for the best."

30. Based on information and belief, Baylor, Briles and McCaw were aware that in November of 2011, Elliott had been cited for misdemeanor sexual assault, stemming from allegations that he had trapped a community college student in her room, held her against her will, and touched her inappropriately.

31. One former member of Baylor's advisory board that reviewed sexual assault response issues with community leaders has publicly stated that Baylor officials have known about the larger problem of sexual assaults committed by student-athletes for several years.

32. This former member is also a Sexual Assault Nurse Examiner ("SANE") for the Waco area, meaning she is the first person most assault victims talk to when they check themselves in to a hospital after being sexually assaulted. In that capacity, this SANE nurse has estimated that despite only making up 4% of the student population at Baylor, male student-athletes are responsible for 25%-50% of all reported assaults that occur at Baylor.

**Baylor's Practice of Ignoring Sexual Violence Committed By Football Players**

33. The way Baylor dealt with the several allegations accusing Elliot of sexual misconduct was not unique to Elliot. Rather, for several years, Baylor has engaged in a practice of failing to address, and actively concealing from the public, specific instances of violence and sexual violence committed by its football players.

34. In 2013, a female Baylor student, Jane Roe 2, reported to Waco police that she had been sexually assaulted by two Baylor football players, former All Big-12 player Tre'Von Armstead and Myke Chatman. The police report associated with the incident indicated that police had informed Baylor about the incident around the time of the incident. Based on information and belief, despite knowledge of the incident in 2013, Baylor ignored the report, until it finally commenced an investigation two years later on September 11, 2015.

35. As a result of its investigation two years after the incident, Armstead was kicked off of the Baylor football team and expelled from school. Despite ultimately being found guilty by Baylor's internal investigation process two years later, Armstead was allowed to remain on campus, in good standing, and continue his participation on the Baylor football team for two years following the incident.

36. Though internal documents uncovered later by ESPN show that Armstead was expelled because of the incident, publicly, Baylor did not disclose the true reason for Armstead's expulsion. Instead, Baylor announced publicly that Armstead was being disciplined for a "team rules violation."

37. Prior to the 2013 football season, Sam Ukwuachu transferred to Baylor after being dismissed from the Boise St. University football team.  Boise St. University's then head football coach, Chris Peterson, has publicly stated that he informed Briles that Ukwuachu was dismissed from Boise St. due to his violent past.

38. In October of 2013, a female Baylor student, Jane Roe 3, reported to Baylor that she had been raped by Ukwuachu.  Baylor conducted a cursory investigation that "cleared" Ukwuachu of any wrongdoing.  In the meantime, Ukwuachu was criminally indicted for his rape of Jane Roe 3.  Ostensibly because of his pending criminal proceedings, Ukwuachu was not placed on the active roster for the 2014 season.  Baylor did not provide the reason for Ukwuachu's absence from the active roster, instead, claiming that he had been left off the roster for "some issue."

39. Despite his indictment and pending criminal proceedings, Ukwuachu was allowed to remain on campus, unrestricted and was allowed to actively participate in all Baylor football activities, including strength and conditioning and practice, except for actual games.

40. As recently as two months before Ukwuachu's criminal trial, Baylor football's defensive coordinator announced publicly that he expected Ukwuachu to play during the 2015 football season.

41. In August of 2015, despite being "cleared" of any wrongdoing by Baylor's grievance process, Ukwuachu was criminally convicted of raping Jane Roe 3 and sentenced to six months in prison and ten years of probation.

42. Baylor settled Jane Roe 3's civil claim prior to Jane Roe 3 filing a civil lawsuit.

43. Plaintiff is informed, believes and on that basis alleges that a female student athlete, Jane Roe 4, was gang raped by Baylor football players in 2011.  Baylor had actual knowledge of Jane Roe 4's gang rape but failed to respond promptly and equitably.  As a result of Baylor's inequitable response, Jane Roe 4 transferred out of Baylor to another university.

**The Pepper Hamilton Finding Of Fact**

44. After Elliot's and Ukwuachu's criminal convictions, in response to mounting public pressure to address the issue of sexual violence at Baylor, in August of 2015, Baylor's President at the time, Kenneth Starr ("Starr") announced the commission of an independent investigation to be conducted by the law firm of Pepper Hamilton LLP ("Pepper").

45. Specifically, Pepper was engaged to "…conduct an independent and external review of Baylor University's institutional response to Title IX and related compliance issues through the lens of specific cases."

46. Pepper's investigation consisted, in part, of a "…high-level audit of all reports of sexual harassment or violence for three academic years from 2012-2013 through 2014-2105."

47. In May of 2016, Pepper released a Finding of Fact document that outlined Baylor's voluminous failures in addressing and responding to sexual misconduct on campus.

48. Pepper concluded that "…the University's student conduct processes were wholly inadequate to consistently provide a prompt and equitable response under Title IX, that Baylor failed to consistently support complainants through the provision of interim measures, and that in some cases, the University failed to take action to identify and eliminate a potential hostile environment, prevent its recurrence, or address its effects for individual complainants or the broader campus community."

49. Regarding Baylor's football program and athletic department, the Finding of Fact concluded, "In addition to broader University failings, Pepper found specific failings within both the football program and Athletics Department leadership, including a failure to identify and respond to a pattern of sexual violence by a football player, to take action in response to reports of a sexual assault by multiple football players, and to take action in response to a report of dating violence. Pepper's findings also reflect significant concerns about the tone and culture within Baylor's football program as it relates to accountability for all forms of athlete misconduct."

50. Pepper's finding of fact concluded that, "Prior to the 2014-2015 academic year, Baylor failed to provide training and education to students; failed to identify and train responsible employees under Title IX; failed to provide clear information about reporting options and resources on campus; failed to have a centralized process for ensuring that all reports reached the Title IX Coordinator; failed to impose appropriate interim measures in many cases; failed to appropriately evaluate and balance institutional safety and Title IX obligations against a complainant's request for anonymity or that no action/investigation be pursued against; failed to conduct prompt, equitable, adequate, and reliable investigations; failed to give complainants access to full range of procedural options under the policy; and failed to take sufficient action to identify, eliminate, prevent and address a potential hostile environment in individual cases."

51. The Finding of Fact listed several other failures, including:

- "The University failed to conduct sufficient inquiry into individual barriers to participation, which in some instances were directly related to barriers created by conversations with University personnel that discouraged, rather than encouraged, participation in the University's Title IX processes."

- "Even in those cases where a complainant did choose to move forward, Baylor did not pursue hearings in the majority of reports, sometimes because of an erroneous determination that Baylor did not have jurisdiction in off campus matters or because the investigator in Judicial Affairs improperly determined that there was not a preponderance of the evidence based on an inadequate or uninformed investigation."

- "As a consequence, in some cases, the University failed to take action to identify and, as needed, eliminate a potential hostile environment, prevent its recurrence, or address any effects on the individual complainant or broader campus community."

- "The investigations reviewed were wholly inadequate to fairly and reliably evaluate whether sexual violence had occurred."

- "Administrators engaged in conduct that could be perceived as victim-blaming, focusing on the complainant's choices and actions, rather than robustly investigating the allegations, including the actions of the respondent."

- "Prior to the 2014-2015 academic year, Baylor failed to conduct adequate training and education for its students and employees, and…Baylor's students lacked awareness of the range of conduct prohibited under Title IX and of University policies, resources or reporting options."

52. Specific to Baylor's football program, Pepper found several failures, including but not limited to:

- "…[T]he University and Athletics Department failed to take effective action in response to allegations involving misconduct by football staff."

- "…[D]espite the fact that other departments repeatedly raised concerns that the Athletics Department's response to student or employee misconduct was inadequate, Baylor administrators took insufficient steps to address the concerns."

- "Baylor failed to take appropriate action to respond to reports of sexual assault and dating violence reportedly committed by football players."

- "In certain instances, including reports of a sexual assault by multiple football players, athletics and football personnel affirmatively chose not to report sexual violence and dating violence to an appropriate administrator outside of athletics. In those instances, football coaches or staff met directly with a complainant and/or a parent of a complainant and did not report the misconduct. As a result, no action was taken to support complainants, fairly and impartially evaluate the conduct under Title IX, address identified cultural concerns within the football program, or protect campus safety once aware of a potential pattern of sexual violence by multiple football players."

10

- "Football staff conducted their own untrained internal inquiries, outside of policy, which improperly discredited complainants and denied them the right to a fair, impartial and informed investigation, interim measures or processes promised under University policy. In some cases, internal steps gave the illusion of responsiveness to complainants but failed to provide a meaningful institutional response under Title IX. Further, because reports were not shared outside of athletics, the University missed critical opportunities to impose appropriate disciplinary action that would have removed offenders from campus and possibly precluded future acts of sexual violence against Baylor students. In some instances, the football program dismissed players for unspecified team violations and assisted them in transferring to other schools. As a result, some football coaches and staff abdicated responsibilities under Title IX and Clery; to student welfare; to the health and safety of complainants; and to Baylor's institutional values."

- "Athletics personnel failed to recognize the conflict of interest in roles and risk to campus safety by insulating athletes from student conduct processes. Football coaches and staff took affirmative steps to maintain internal control over discipline of players and to actively divert cases from the student conduct or criminal processes. In some cases, football coaches and staff had inappropriate involvement in disciplinary and criminal matters or engaged in improper conduct that reinforced an overall perception that football was above the rules, and that there was no culture of accountability for misconduct."

- The football program maintained an ad-hoc, internal system of discipline, separate from any Baylor processes which: (1) resulted in "conduct being ignored or players being dismissed from the team based on an informal and subjective process," (2) lacked protocols for consistency with any Baylor processes and was wholly undocumented, (3) reinforced "…the perception that rules applicable to

11

other students are not applicable to football players, improperly insulates football

players from appropriate disciplinary consequences, and puts students, the

program, and the institution at risk of future misconduct."

- "The football program failed to identify and maintain controls over known risks, and unreasonably accepted known risks."

**Background Facts Related To Plaintiff Jasmin Hernandez**

53. Hernandez enrolled at Baylor in the Fall of 2011.

54. Hernandez had earned an academic scholarship to enroll in Baylor's undergraduate nursing program.

55. On April 15, 2012, Hernandez was attending a party at a residence near campus with some friends.  The group of friends was invited to the party by Elliott, as he knew one of Hernandez's friends.  At one point in the night, Hernandez and a friend went to look for a restroom.  While moving through the residence, Hernandez and her friend got separated. Elliott approached Hernandez, grabbed her by the wrist and led her outside.  Hernandez consistently protested that she wanted to go back into the house, but Elliott ignored her. As Hernandez's protestations intensified, Elliott picked Hernandez up over his shoulder and carried her behind a secluded shack on the property.   There, Elliott pushed Hernandez up against an embankment, ripped off her pants and began to rape her. Hernandez managed to pull her pants back up, and in a daze, attempted to find her way back into the house.   Instead, Elliott grabbed Hernandez again, pulled her pants back down and began raping her again.  When he was finished, he allowed Hernandez to put her clothes back on and go.

56. Hernandez stumbled back into the party and found her friends.  She informed them what had happened, and they immediately drove Hernandez to the nearest hospital where a rape kit was performed.

57. While at the hospital, Hernandez also gave her account of what happened to a Waco Police Department officer.

12

58. The next day, Hernandez called her mother ("Mother") to inform her what had happened. Mother flew out to Waco the very next day.

59. Upon arriving in Waco, Mother immediately called the Baylor Counseling Center to inform them that her daughter had just been raped, and to request that her daughter be given mental health services to help mitigate the effects of such a traumatic event. The Counseling Center informed Mother that they were too busy, and could not see Hernandez.

60. Next, Mother called the psychology department at Baylor's Student Health Center to request services for her daughter. The Student Health Center informed Mother that all counseling sessions were full, and they could not provide any services to Hernandez.

61. A few days later, Mother called Baylor's Academic Services Department to request academic accommodations for her daughter, who was still traumatized from being raped and would not be able to fully concentrate on her studies for some time. The Academic Services Department refused to provide any accommodations, telling Mother that even "if a plane falls on your daughter, there's nothing we can do to help you."

62. Mother also called Briles to inform him about what Elliott, one of Briles' football players had done. Mother received a return phone call from Briles' secretary informing Mother that her office had heard of the allegations and were looking into it.

63. Hernandez's father also called Briles' office several times to follow up. Hernandez's father never received a return phone call from Briles or anyone in his office.

64. Despite Hernandez's multiple reports to several administrative offices that she had been raped by another Baylor student, Baylor did not take any action whatsoever to investigate Hernandez's claim.

65. Despite having been accused of raping Hernandez, Elliott was allowed to remain on campus, completely unrestricted, for several months until he ultimately transferred during the summer of 2012. Elliott's mere presence on campus subjected Hernandez to additional harassment, by making her vulnerable to an encounter with Elliott, the man

that raped her, at any time and at any place on campus.

66. Defendant failed to properly train and educate their employees, including school officials, officers, investigators, and adjudicators in appropriate response to allegations of sexual harassment, sexual abuse, and retaliatory conduct, as well as necessary Title IX policies and procedures.

67. Defendant failed to adequately educate Baylor students, including but not limited to Elliott, on the dangers of sexual harassment, assault and retaliatory conduct, including but not limited to the impact of such conduct on victims.

68. During the relevant time period, Defendant failed to comply with Title IX by failing to have a dedicated Title IX coordinator.  Defendant only hired a full-time, dedicated Title IX coordinator in 2014, several years after Hernandez's rape.

69. These failures, and others, amounted to an intentional violation of Title IX by Defendant.

70. Defendants also acted with deliberate indifference towards Hernandez's reports of rape to several different Baylor departments as reflected by Defendants' actions and inaction alleged herein.

71. Defendant Baylor, in violation of 34 C.F.R. § 106.8, failed to provide a designated Title IX coordinator to whom Plaintiff would have been able to report her complaint of sexual assault by a fellow student.  Moreover, Defendant Baylor intentionally violated Title IX by misinforming and misleading Plaintiff that she had no recourse at Defendant Baylor for remedying and responding to her complaints of sexual assault by Elliott or of the availability of accommodation she was entitled to by law.

72.  Based upon information and belief, Plaintiff alleges that Defendant Baylor at the time of Plaintiff's reports of sexual assault by Elliot, was in violation of Title IX's requirement that the University have a clear, widely available, and easily accessible non-gender discrimination policy and/or sexual misconduct policy advising students, including Plaintiff, of their rights and remedies in the event that they are sexually assaulted or harassed by a fellow student or employee of the University.

73. Based upon information and belief, Plaintiff alleges that Defendant Baylor did not conduct mandatory educational sessions or programs regarding the topics of alcohol abuse, sexual misconduct and or student rights and remedies under state and federal law as required by the OCR.  If in fact Defendant University did provide any such educational sessions or programs, they failed to insure that such programs or sessions were attended by Baylor students, including student athletes.

74. Plaintiff was not otherwise aware of her Title IX remedies at the time she made reports to University authorities of the sexual assault by Elliott.

75. As a result of Defendants' actions and inaction in response to Hernandez's report of rape by Elliott, and as a result of her ongoing fear of encountering Elliott, her rapist, on campus, Hernandez was deprived of a multitude of educational opportunities and/or benefits, including but not limited to:

- A significant drop in her grades;
- Being placed on academic probation as a result of her drop in grades;
- Avoidance of social activities on campus;
- Avoidance of certain areas of campus;
- A loss of her academic scholarship that she had earned to attend Baylor;
- Withdrawal from Baylor altogether.

**FIRST CAUSE OF ACTION**
**DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF 20 U.S.C. § 1681**
**(TITLE IX)**
**(AGAINST DEFENDANT BAYLOR)**

76. Plaintiff incorporates all paragraphs of this Complaint is if fully set forth herein.

77. Baylor's acts and failures to act perpetrated against Plaintiff amounted to unlawful sexual harassment and discrimination on the basis of gender.  The harassment and discrimination was sufficiently severe and pervasive to create an abusive, and sexually hostile educational environment for Plaintiff.  One or more Baylor administrators or

officials, with authority to take corrective action on Plaintiff's behalf, had actual notice of said harassment and discrimination and failed to adequately respond, in violation of their own policies. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur. As a result, Plaintiff was subject to continuing harassment and a loss of educational opportunity.

78. Additionally, and/or in the alternative, Baylor failed to enact and/or disseminate and/or implement proper or adequate procedures to discover, prohibit or remedy the kind of gender based discrimination that Plaintiff suffered. This failure included, without limitation, non-existent or inadequate customs, policies or procedures for the recognition, reporting, investigation and correction of unlawful gender based discrimination, and the failure to properly vet recruited student-athletes such as Elliott. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur. As a result, Plaintiff was subject to continuing harassment and a loss of educational opportunity.

79. Prior to Plaintiff's rape by Elliot, Baylor had actual knowledge that sexual misconduct was pervasive among its football program. Defendant Baylor, its Athletic Department and its football program demonstrated a policy and practice of: recruiting or otherwise retaining, and failing to adequately supervise, football players with a history of violence and sexual misconduct; covering up sexual misconduct by its football players; failing to report sexual misconduct committed by football players to law enforcement or relevant Baylor administrators; engaging in ad-hoc, internal disciplinary procedures that resulted in a lack of discipline for football players that engaged in sexual misconduct; engaging in unequal investigatory procedures that improperly favored male football players accused of engaging in sexual misconduct over their female student victims; discrediting female student victims of sexual misconduct committed by football players; tolerating and tacitly approving sexual violence committed by football players; creating an atmosphere

whereby the rules applicable to all students did not apply to football players.  Baylor acted with deliberate indifference by acting clearly unreasonably in response to this knowledge.

80. Baylor had actual knowledge that Elliot had been convicted of a misdemeanor sexual assault in 2011 and had been accused of sexually assaulting at least seven female Baylor students prior to raping Plaintiff.  Baylor acted with deliberate indifference by failing to take any actions whatsoever in response to this knowledge.

81. Baylor acted with deliberate indifference in deviating significantly from the standard of care outlined by the DOE in the Dear Colleague Letter of 2011 and Baylor's own policies.

82. As a result of Baylor's deliberate indifference, Plaintiff was forced to endure a sexually hostile environment on campus and Plaintiff suffered loss of educational opportunities and/or benefits.  Plaintiff has incurred, and will continue to incur, attorney's fees and costs of litigation.

83. At the time of the allegations contained herein, Plaintiff was unaware, nor with reasonable diligence could have been aware, of Baylor's institutional failings with respect to their responsibilities under Title IX because Baylor actively concealed its own misconduct.  Plaintiff first learned about Baylor's institutional failings under Title IX in May of 2016 when the Pepper Finding of Fact was released publicly.

84. At the time of the allegations contained herein, Plaintiff was unaware of Baylor's pervasive failings with respect to its response to a known issue of sexual misconduct within its football program dating back several years prior to Plaintiff's rape.  Because Baylor actively concealed this information from Plaintiff and the general public, Plaintiff could not, with reasonable diligence, have learned this information independently.  Plaintiff first became aware of Baylor's deliberate indifference to a known issue of sexual misconduct within its football program in May of 2016 when the Pepper Finding of Fact was released publicly.

85. At the time of the allegations contained herein, Plaintiff was unaware of Baylor's deliberate indifference to the actual knowledge that Elliot had been accused of sexually assaulting seven female Baylor students, and had been convicted of a misdemeanor sexual assault, prior to raping Plaintiff. Because Baylor actively concealed this information from Plaintiff and the general public, Plaintiff could not, with reasonable diligence, have discovered this information independently. Plaintiff first became aware of Baylor's deliberate indifference to the actual knowledge of Elliot's history of pervasive sexual violence in January of 2016 when she was independently contacted by a reporter seeking information for a story on Baylor's inadequate response to sexual misconduct committed by football players.

## SECOND CAUSE OF ACTION
## NEGLIGENCE
## (AGAINST DEFENDANT BAYLOR)

86. Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

87. At all times relevant, Baylor owed extensive duties to supervise Elliott and protect Plaintiff from Elliott, who had a known history of sexually assaulting women. Baylor also owed duties to competently supervise Baylor's Football program and Athletics Department and to train and educate Baylor's employees. Baylor voluntarily undertook additional duties to protect Plaintiff, and took actions that increased the likelihood that Plaintiff, and other female students, would be sexually abused by Elliott, or other student athletes.

88. Baylor owed a duty to take reasonable measures to protect Plaintiff as a student at Baylor, because they knew that Elliott had sexually assaulted at least six women, prior to assaulting Plaintiff, including other Baylor students. Thus, Baylor was aware of the need to control Elliott, and had the ability to control Elliott. Baylor also had a duty to take reasonable protective measures to protect Plaintiff and other similarly situated students from the risk of sexual abuse and/or sexual assault, such as the duty to properly warn,

train or educate Plaintiff and other students about how to avoid such a risk. This created a special relationship between Baylor and Plaintiff who was entrusted to Baylor's care. Baylor voluntarily accepted the entrusted care of Plaintiff.

89. Baylor, by and through its agents, servants and employees, knew or reasonably should have known of Elliott's dangerous and exploitive propensities, as a result of prior reports of sexual assault by Elliott, and the prevalence of sexual assault and retaliatory conduct against reporters of sexual assault at Baylor and other universities and/or institutions of higher learning. With this knowledge, it was foreseeable that if Baylor did not adequately exercise or provide the duty of care owed to students, including but not limited to Plaintiff, female students would be vulnerable to sexual assault and retaliatory conduct by Elliott and others.

90. Baylor voluntarily undertook an obligation to protect Plaintiff, and other female students, from sexual assault by Elliott. Baylor received multiple prior complaints that Elliott had sexually assaulted women. Consistent with Baylor's practice of allowing "football staff to conduct their own untrained inquiries," and the admission by Briles' secretary that this would be done with Plaintiff's report regarding her rape by Elliott, Plaintiff is informed and believes and on that basis alleges that earlier reports of sexual misconduct by Elliott had also resulted in untrained, informal, and ineffective investigations. By affirmatively undertaking to investigate complaints that Elliott had sexually assaulted women, Baylor undertook an obligation to do so competently and to monitor Elliott for the protection of female students.

91. By instituting and maintaining an "ad hoc, internal system of discipline" for football players, including Elliott, and by conducting untrained, flawed, and biased investigations Baylor "reinforced the perception that rules applicable to other students are not applicable to football players" and thereby affirmatively increased the likelihood that Plaintiff, and other female students, would be raped by football players, who knew they were unlikely to face any repercussions from their actions. By voluntarily entering an affirmative

course of action affecting the interests of Plaintiff, Baylor assumed a duty to act with reasonable care.

92. Baylor failed to ensure that its employees involved in responding to allegations of sexual assault of students were trained and educated to competently respond to allegations under Title IX.  And, by instituting and maintaining an "ad hoc, internal system of discipline" for football players, including Elliott, Baylor additionally assumed a duty to ensure that the individuals implementing that system were properly trained and educated.

93. Baylor's agents, servants and employees, were acting within the course and scope of their employment at all times relevant.  Baylor breached its duty of care to Plaintiff through the acts and omissions described herein, and by deviating significantly from the standard of care outlined by the DOE in the Dear Colleague Letter of 2011.

94. Defendant Baylor breached its duty of care by engaging in conduct including, but not limited to:

- Failing to assure adequate staff training to meet the behavior and social needs of all individuals, including sexual assault victims;

- Failing to train faculty and staff to respond to allegations of sexual assault in a manner consistent with Title IX;

- Failing to implement a system to screen prospective faculty and staff training history;

- Failing to supervise faculty and staff to ensure proper supervision, control, restraint and monitoring of student athletes;

- Failing to properly train faculty and staff to screen the backgrounds (criminal and social) of student athletes that are recruited to play sports at the University;

- Failing to properly train and/or educate the faculty and staff responsible for caring for recruiting student athletes with criminal and anti-social backgrounds;

- Failing to appropriately monitor to ensure that student athletes are not brought on to campus without regard to the safety of other students;

- Failing to implement safeguards for female students adequate to protect them from foreseeable criminal and anti-social activities;

- Failing to competently investigate prior allegations Elliott had sexually assaulted women;

- Sanctioning and carrying out untrained, informal investigations of reports that Elliott and other football players has sexually assaulted women;

- Using untrained personnel, and informally investigating reports that Elliott and other football players had sexually assaulted women as a means of creating the appearance that Athletic Department and football staff were responsive to such complaints, while actually improperly discrediting complainants and allowing football players to escape responsibility;

- Failing to train football and Athletic Department staff to competently respond to allegations of sexual assault by football players; and

- Failing to require football and Athletic Department staff to report allegations of sexual assault by football players to an appropriate University contact;

- Failing to provide supervision and training in administration of counseling of rape victims following an attack (to wit: having a counselor encourage a victim to refrain from reporting her attack); and

- Ratifying the sexual misconduct of student athletes by University officials by failing to discourage such behavior in prior instances.

95. But for the intentional and negligent acts and omissions of Baylor and its violations of the standards of care and statute set forth herein, Plaintiff would not have been injured. Baylor's intentional and negligent acts and omissions therefore amount to negligence, negligent failure to warn, train and/or educate, and negligence per se.

96. As a result of the above-described conduct, Plaintiff has suffered, and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace,

humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

### THIRD CAUSE OF ACTION
### NEGLIGENCE
### (AGAINST DEFENDANTS BRILES AND MCCAW)

97. Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

98. Defendants Briles and McCaw owed a duty to take reasonable measures to protect Plaintiff, because they knew, or with reasonable diligence should have known, that Elliott had sexually assaulted at least six women, prior to assaulting Plaintiff, including other Baylor students.  Thus, Briles and McCaw were aware of the need to control Elliott, and had the ability to control Elliott. This created a special relationship between Briles and McCaw, and Plaintiff.

99. Briles and McCaw also had a duty to take reasonable protective measures to protect Plaintiff and other similarly situated students from the risk of sexual abuse and/or sexual assault, such as the duty to properly warn, train or educate Elliott and other Baylor football players about sexual violence.

100. Briles and McCaw, individually or by and through their agents, voluntarily undertook an obligation to protect Plaintiff, and other female students, from sexual assault by Elliott. Briles and McCaw, individually or by and through their agents, voluntarily undertook to investigate the complaints of sexual misconduct against Baylor football players, including Elliott.  Briles and McCaw knew, or with reasonable diligence should have known, that Elliott had sexually assaulted several women prior to assaulting Plaintiff. Briles' secretary admitted that Briles and McCaw, individually or by and through their agents, would investigate Plaintiff's report regarding her rape by Elliott.   By

affirmatively undertaking to investigate complaints that Elliott had sexually assaulted women, Briles and McCaw undertook a duty to do so competently and to monitor Elliott for the protection of female students.

101. By instituting and maintaining an "ad hoc, internal system of discipline" for football players, including Elliott, and by conducting untrained, flawed, and biased investigations Briles and McCaw "reinforced the perception that rules applicable to other students are not applicable to football players" and thereby affirmatively increased the likelihood that Plaintiff, and other female students, would be raped by football players, who knew they were unlikely to face any repercussions from their actions.  By voluntarily entering an affirmative course of action affecting the interests of Plaintiff, Briles and McCaw assumed a duty to act with reasonable care.

102. Defendant Briles and Defendant McCaw breached their duty of care by engaging in conduct including, but not limited to:

- Failing to properly train and/or educate student-athlete members of the Baylor football team regarding sexual misconduct;

- Failing to appropriately monitor to ensure that student athletes are not brought on to campus without regard to the safety of other students;

- Failing to implement safeguards for female students adequate to protect them from foreseeable sexual assaults by student-athlete members of the football team;

- Failing to supervise faculty and staff to ensure proper supervision, control, restraint and monitoring of student athletes;

- Failing to monitor or supervise Elliott, despite their knowledge that he had sexually assaulted multiple female students prior to sexually assaulting Plaintiff;

- Failing to competently investigate prior allegations Elliott had sexually assaulted women;

- Sanctioning and carrying out untrained, informal investigations of reports that Elliott and other football players has sexually assaulted women;

- Using untrained, informal investigations of reports that Elliott and other football players had sexually assaulted women as a means of creating the appearance that Athletic Department and football staff were responsive to such complaints, while actually improperly discrediting complainants and allowing football players to escape responsibility;

- Failing to train football and Athletic Department staff to competently respond to allegations of sexual assault by football players; and

- Failing to require football and Athletic Department staff to report allegations of sexual assault by football players to an appropriate University contact.

103. But for the intentional and negligent acts and omissions of Briles and McCaw, and their violations of the standards of care and statute set forth herein, Plaintiff would not have been injured.  Briles' and McCaw's intentional and negligent acts and omissions therefore amount to negligence, and negligent failure to warn, train and/or educate.

104. As a result of the above-described conduct, Plaintiff has suffered, and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

105.     Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

106.     Each Defendant, as described herein, acted intentionally and/or recklessly by tolerating, permitting and concealing acts of sexual assault and rape by student athletes,

and cultivating an environment where sexual assault by male student athletes was excused and went unpunished.

100. Each Defendant's conduct of tolerating, permitting and concealing acts of sexual assault of women and of cultivating an environment where sexual assault by male student athletes was excused, was extreme and outrageous.

101. But for the intentional acts of the Defendants, Plaintiff would not have been injured.

102. As a result of the above-described conduct, Plaintiff has suffered, and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

103. The emotional distress suffered by the Plaintiff was severe.

### RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays for damages; punitive damages; costs; interest; statutory/civil penalties according to law; attorneys' fees and costs of litigation, pursuant to 42 U.S.C. §1988 or other applicable law; and such other relief as the court deems appropriate and just.

### PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS

Dated:  October 12, 2016                    Respectfully submitted,

                                            /s/ Susan Hutchison
                                            Susan Hutchison (#10354100)
                                            hutch@hsjustice.com
                                            HUTCHISON & STOY PLLC
                                            509 Pecan Street, Suite 201
                                            Fort Worth TX  76102
                                            Telephone: (817) 820-0100
                                            Facsimile: (817) 820-0111

                                            Alexander S. Zalkin
                                            alex@zalkin.com
                                            Ryan M. Cohen
                                            ryan@zalkin.com
                                            THE ZALKIN LAW FIRM, P.C.
                                            12555 High Bluff Drive, Ste. 301
                                            San Diego CA  92130
                                            Telephone: (858) 259-3011
                                            Facsimile: (858) 259-3015

                                            *Attorneys for Plaintiff Jasmin Hernandez*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 12, 2016, I electronically filed the foregoing paper with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter.

THE ZALKIN LAW FIRM, P.C.

/s/ Alexander S. Zalkin
Alexander S. Zalkin (CSB#280813)
alex@zalkin.com
THE ZALKIN LAW FIRM, P.C.
12555 High Bluff Drive, Ste. 301
San Diego CA  92130
Telephone: (858) 259-3011
Facsimile: (858) 259-3015

Dated: October 12, 2016