IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JASMIN HERNANDEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 6:16-CV-69-RP |
| | § | |
| BAYLOR UNIVERSITY, et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Plaintiff Jasmin Hernandez ("Plaintiff"), a former student at Baylor University who was sexually assaulted by a fellow student during her freshman year, brings this suit against Defendants Baylor University ("Baylor"), (Second Am. Compl., Dkt. 53, ¶ 1); former Baylor Head Football Coach Art Briles ("Defendant Briles"), (*id.* ¶ 2); and former Baylor Athletic Director Ian McCaw ("Defendant McCaw"), (*id.* ¶ 3). Plaintiff seeks to hold Baylor liable under Title IX of the Education Amendments Act of 1972 ("Title IX"), which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); (Second Am. Compl., Dkt. 53, at 15). She also seeks to hold Baylor, Defendant Briles, and Defendant McCaw liable under the common law doctrines of negligence and intentional infliction of emotional distress. (*Id.* at 18, 22, 24).

At this stage of litigation, the Court considers only whether Plaintiff's Complaint contains plausible factual allegations that, assumed to be true, support a claim for which relief could be granted.

## I. STANDARD OF REVIEW

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the [plaintiff's] grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

## II. FACTUAL BACKGROUND

Before proceeding further, the Court considers Plaintiff's Request for Judicial Notice. (Dkt. 81). Plaintiff requests that the Court, pursuant to Federal Rule of Evidence 201, take judicial notice of the allegations contained in (1) the Complaint and Jury Demand in *Elizabeth Doe v. Baylor University*, No. 6:17-CV-27 (W.D. Tex.); and (2) the Original Answer filed by Defendants Cary Gray, Ron Murff, and David Harper in *Colin Shillinglaw v. Baylor University et al.*, No. DC-17-01225 (116th Dist. Ct., Dallas County).

Federal Rule of Evidence 201 allows a court to take judicial notice of an "adjudicative fact" if the fact is not subject to reasonable dispute in that it is (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to resources whose accuracy cannot be questioned. *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829–30 (5th Cir. 1998) (indicating that, for a fact to be eligible for judicial notice under Rule 201, it should be a "self-evident truth that no reasonable person could question, a truism that approaches platitude

2

or banality"). "A court may take judicial notice of 'a document filed in another court . . . to establish the fact of such litigation and related filings,' but generally cannot take notice of the findings of fact from other proceedings." *Ferguson v. Extraco Mortg. Co.*, No. 06-51453, 2007 WL 2493537, at *1 (quoting *Taylor*, 162 F.3d at 829–830); *see also Anderson v. Dallas Cty., Tex.*, No. 3:05-CV-1248, 2007 WL 1148994, at *3–4 (N.D. Tex. April 18, 2007), *aff'd*, 286 F. App'x 850 (5th Cir. 2008).

Here, Plaintiff asks the Court to take judicial notice of more than 100 pages of documents, consisting primarily of allegations made by other parties in other lawsuits. Those allegations are not "adjudicative facts" within the meaning of Federal Rule of Evidence 201, nor are they generally known or beyond reasonable dispute. Accordingly, these facts are not appropriate for proof by judicial notice. This position is consistent with the law governing courts' consideration of motions to dismiss. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) ("Because the court reviews only the well-pleaded facts *in the complaint*, it may not consider new factual allegations made outside the complaint." (emphasis added)).

Having denied Plaintiff's request to take judicial notice of the material described above, the Court proceeds to a summary of the factual allegations made in the instant case.

### A. Allegations Regarding Plaintiff's Assault and Reporting Experience

Plaintiff enrolled at Baylor in the fall of 2011. (Second Am. Compl., Dkt. 53, ¶ 53). On April 15, 2012, she was sexually assaulted by Tevin Elliott ("Elliott") while attending an off-campus party. (*Id.* ¶ 55). At the time, Elliott was a player on the Baylor football team. (*Id.* ¶ 27). Plaintiff immediately reported the assault to the Waco Police Department. (*Id.* ¶ 57).

Two days after the assault, Plaintiff's mother reported the incident to the Baylor Counseling Center and Baylor Student Health Center. (*Id.* ¶¶ 59, 60). Staff at both service providers allegedly responded that Plaintiff could not receive treatment because the Centers were "too busy" or "full." (*Id.*). A few days later, Baylor's Academic Services Department also allegedly "refused to provide any

3

accommodations." (*Id.* ¶ 61). During the relevant time period, Baylor did not have a dedicated Title IX coordinator. (*Id.* ¶ 68).[1]

Plaintiff's mother subsequently called Defendant Briles to inform him of the assault; she allegedly received a return phone call from a member of Defendant Briles's staff informing her that the office had "heard of the allegations" and was "looking into it." (*Id.* ¶ 62). Plaintiff's father also allegedly called Defendant Briles's office "several times," but never heard back. (*Id.* ¶ 63).

Despite these reports, Plaintiff alleges, Baylor "did not take any action whatsoever to investigate [her] claim." (*Id.* ¶ 64). Elliott was "allowed to remain on campus" until transferring to another school during the summer of 2012, thereby subjecting Plaintiff to additional harassment by "making her vulnerable to an encounter with Elliott . . . at any time at any place on campus." (*Id.* ¶ 65). As a result, she alleges, she was "deprived of a multitude of educational opportunities and/or benefits, including but not limited to [a] significant drop in her grades, [b]eing placed on academic probation as a result of her drop in grades; [a]voidance of social activities on campus; [a]voidance of certain areas of campus; [a] loss of her academic scholarship[]; and [w]ithdrawal from Baylor altogether." (*Id.* ¶ 75).

**B. Allegations Regarding Baylor's General Handling of Reports of Sexual Assault**

Plaintiff's Complaint relies, in substantial part, on findings made by the law firm Pepper Hamilton LLP as part of an investigation the firm conducted into Baylor's handling of sexual assault allegations between 2012 and 2016. (*Id.* ¶¶ 44–46). The "findings of fact" released by the firm in May 2016 concluded that "the University's student conduct processes were wholly inadequate to consistently provide a prompt and equitable response under Title IX." (*Id.* ¶ 47–48). "Baylor did not pursue [administrative] hearings in the majority of reports [of sexual assault]," the report found, leading the university to "fail[] to take action to identify and, as needed, eliminate a potential hostile

---

[1] Baylor did not hire a full-time Title IX coordinator until 2014. (Second Am. Compl., Dkt. 53, ¶ 68).

environment, prevent its recurrence, or address any effects on the individual complainant or broader campus community." (*Id.* ¶ 51). The investigations the university did conduct were "wholly inadequate to fairly and reliably evaluate whether sexual violence had occurred," and "[a]dministrators engaged in conduct that could be perceived as victim-blaming." (*Id.*).

### C. Allegations Regarding the Baylor Football Program and Athletics Department

According to Plaintiff, Baylor has failed to address and actively concealed sexual violence committed by its football players for several years. (*Id.* ¶ 33).

Pepper Hamilton documented "specific failings within both the football program and Athletics Department leadership, including a failure to identify and respond to a pattern of sexual violence by a football player, to take action in response to reports of a sexual assault by multiple football players, and to take action in response to a report of dating violence." (*Id.* ¶ 49). Specifically, football coaches or staff allegedly were repeatedly and directly informed of sexual assaults committed by football players and did not report the misconduct. (*Id.* ¶ 52). Athletic staff instead "conducted their own untrained internal inquiries, outside of policy, which improperly discredited complainants and denied them the right to a fair, impartial, and informed investigation." (*Id.* ¶ 52). Those reports "were not shared outside of [the athletics department]," and "[f]ootball coaches and staff took affirmative steps to maintain internal control over discipline of players and to actively divert cases from the student conduct or criminal processes." (*Id.*). The university therefore "missed critical opportunities to impose appropriate disciplinary action that would have removed offenders from campus and possibly precluded future acts of sexual violence against Baylor students." (*Id.*). Moreover, the situation gave rise to an "overall perception that football was above the rules and that there was no culture of accountability for misconduct." (*Id.*).

A former member of Baylor's advisory board allegedly stated that "Baylor officials have known about the larger problem of sexual assaults committed by student–athletes for several years."

(*Id.* ¶ 31). According to that individual, male student–athletes at Baylor are responsible for between 25 percent and 50 percent of all reported assaults that occur at the university. (*Id.* ¶ 32).

**D. Allegations Regarding Defendants' Knowledge of Prior Reports Involving Tevin Elliott**

At some point prior to Plaintiff's sexual assault, an unidentified female student allegedly informed Baylor Chief Judicial Officer Bethany McCraw ("McCraw") that she had been sexually assaulted by Tevin Elliott ("Elliott"). (*Id.* ¶ 27). McCraw allegedly told the unidentified student that she was the sixth student to report a sexual assault by Elliott, that Defendant Briles was aware of the reports, and that "there was nothing the school could do" for the student absent a "court determination" that Elliott had indeed assaulted her. (*Id.* ¶ 28). Separately, McCraw, Baylor, and Defendant Briles were also allegedly aware that Elliott was cited for misdemeanor sexual assault in November 2011. (*Id.* ¶ 30).

## III. TITLE IX

Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex in all federally-funded educational programs. 20 U.S.C. § 1681(a). Specifically, it provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

*Id.* When Congress first passed Title IX more than forty years ago, it had two related objectives: first, Congress wanted to prevent federal funds from being used to support discriminatory practices; second, it wanted to provide individuals "effective protection against those practices." *Cannon v. Univ. Chic.*, 441 U.S. 677, 704 (1979); *see also* 118 Cong. Rec. 5730 (1972) (statement of Senator Birch Bayh) ("The amendment we are debating is a strong and comprehensive measure which I believe is needed if we are to provide women with solid legal protection as they seek education and training for later careers. . . . As a matter of principle, our national policy should prohibit sex discrimination at all levels of education."). When private universities like Baylor accept funding through various

federal programs, including by enrolling students who receive federal funds to pay for their education, they become subject to the requirements of Title IX. *See Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 466 (1999).

Title IX is enforceable through an individual's private right of action and allows for the recovery of damages. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999) (citing *Cannon*, 441 U.S. 607 and *Franklin v. Gwinnett Cty. Public Schs.*, 503 U.S. 60 (1992)).

Title IX claims are commonly asserted in response to a student's sexual harassment or assault. The Supreme Court has held that sexual harassment within a school or school program is a form of sex discrimination when the harassment is so severe, pervasive, and objectively offensive that it deprives the victim of educational opportunities or benefits provided by the school. *Davis*, 526 U.S. at 650. A school can be held liable for such harassment when it is deliberately indifferent to harassment of which it has actual knowledge. *Id.* This is true regardless of whether the harasser is an employee of the school or another student, but liability under this avenue is limited to circumstances in which the school "exercises substantial control over both the harasser and the context" in which the harassment occurs. *Id.* at 645. This framework for liability in sexual harassment cases ultimately serves as a proxy for the showing of intentional discrimination that is otherwise required for Title IX claims. Thus, while the school is not itself committing the sexual harassment, it can be said to be intentionally discriminating if it knows of severe and pervasive sexual harassment occurring within its control and, for example, does nothing. *Gebser*, 524 U.S. at 290.

In the instant case, Plaintiff alleges two types of Title IX claims. First, Plaintiff alleges what might be considered a "traditional" claim for sexual assault under Title IX. She argues that she was sexually assaulted by a peer at Baylor, that she reported her assault to the university, and that Baylor's deliberately indifferent response to that report deprived her of educational opportunities and benefits provided by the school. The Court will refer to this as Plaintiff's "post-reporting claim."

Second, Plaintiff alleges that even prior to her report of sexual assault, Baylor's actual notice of the threat posed by Elliott and other student–athletes and deliberate indifference to that threat— manifested by the university's alleged discouragement of reporting, failure to investigate claims or punish assailants, and perpetuation of a culture in which football players were protected from allegations of misconduct—constituted actionable intentional discrimination that substantially increased Plaintiff's risk of being sexually assaulted. The Court will refer to this as Plaintiff's "heightened-risk claim."[2]

The Court will first address whether Plaintiff has plausibly alleged each of these claims and then consider whether any plausibly alleged claim is barred by the applicable statute of limitations.

## A. Post-Reporting Sexual Harassment

Plaintiff alleges that Baylor was deliberately indifferent to her report of sexual assault, thereby creating a hostile educational environment and subjecting her to further harassment.

As the Court previously explained, under Title IX, a school "may be liable for failing to address student-on-student sexual harassment 'only where [the school is] deliberately indifferent to . . . harassment, of which [it has] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 995 (5th Cir. 2014) (quoting *Davis*, 526 U.S. at 650). For the school to be said to have "actual knowledge" of harassment, an "appropriate person"—"an official of the recipient entity with authority to take corrective action"—must have both actual knowledge of the harassment and an "opportunity to rectify any violation." *Gebser*, 524 U.S. at 290. Further, liability is limited "to circumstances where[]

---

[2] Plaintiff refers to this as a claim of "pre-assault deliberate indifference." (Resp., Dkt. 37, at 2). Because the actionable discrimination of which she complains involves a heightened vulnerability to sexual assault, *see infra* Section III(B), the Court terms this a "heightened-risk" claim. *See Williams v. Bd. Regents Univ. Sys. Ga.*, 477 F.3d 1282, 1296 (explaining that "a Title IX plaintiff at the motion to dismiss stage must allege that the Title IX recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination").

the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. Finally, the "harassment must have a 'concrete, negative effect' on the victims' education, such as creating [a] 'disparately hostile educational environment relative to [the victim's] peer,' forcing the student to change his or her study habits or to move to another [school], or lowering the student's grades.'" *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015) (citations omitted) (applying *Davis* in a Title VI case involving race-based student-on-student harassment).

While allegations of further assault or harassment are necessary for a claim under Title IX, the Supreme Court has made clear that to "subject" a student to harassment a school need only make the student vulnerable to that harassment. *Davis*, 526 U.S. at 645. Thus, the discriminatory harm can include the harm faced by student–victims who are rendered vulnerable to future harassment and either leave school or remain at school and endure an educational environment that constantly exposes them to a potential encounter with their harasser or assailant. *See, e.g.*, *Karasek v. Regents of the Univ. of Cal.*, No. 15-CV-03717, 2015 WL 8527338, at *12 (N.D. Cal. Dec. 11, 2015) (holding that a plaintiff may state a Title IX claim "even in the absence of any further affirmative acts of harassment" and noting that requiring otherwise "runs counter to the goals of Title IX"); *Takla v. Regents of the Univ. of Cal.*, No. 2:15–CV–04418, 2015 WL 6755190, at *5 (C.D. Cal. Nov. 2, 2015) ("[P]lacing undue emphasis on whether further harassment actually occurred to gauge the responsiveness of an educational institution would penalize a sexual harassment victim who takes steps to avoid the offending environment."); *Kelly v. Yale Univ.*, No. CIV.A. 3:01-CV-1591, 2003 WL 1563424, at *3–4 (D. Conn. Mar. 26, 2003).

Baylor argues that non-compliance with regulatory and administrative guidance from the Department of Education ("DOE")—which Plaintiff references in her Complaint—cannot serve as the basis for establishing deliberate indifference. While the Court agrees that a school's failure to

comply with certain DOE guidelines generally cannot, alone, demonstrate a school's deliberate indifference, *see Gebser*, 524 U.S. at 291–92, it also agrees with numerous courts that DOE regulations may still be consulted when assessing the appropriateness of a school's response to reports of sexual assault. *See, e.g., Butters v. James Madison Univ.*, --- F. Supp. 3d ----, 2016 WL 5317695, at *11 (W.D. Va. Sept. 22, 2016) ("[A] school's compliance . . . with the [Dear Colleague Letter] can be a factor that the court considers"); *Doe v. Forest Hills Sch. Dist.*, No. 1:13-CV-428, 2015 WL 9906260, at *10 (W.D. Mich. Mar. 31, 2015) ("Although failure to comply with Title IX guidance does not, *on its own,* constitute deliberate indifference, it is one consideration.").

The Court finds that Plaintiff has plausibly alleged Baylor was deliberately indifferent to her report of sexual assault, thereby depriving her of educational opportunities to which she was entitled. First, Plaintiff alleges she was sexually assaulted by another student while at Baylor. (Second Am. Compl., Dkt. 53, ¶ 55). Second, Plaintiff alleges she reported her assault to the Baylor Counseling Center, Student Health Center, Academic Services Department, and Athletic Department. (*Id.* ¶¶ 59–63). Third, Plaintiff alleges Baylor did nothing (or almost nothing) in response to her report of sexual assault. (*Id.* ¶¶ 59–65). She also alleges that Baylor failed to adequately investigate her assault and failed to ensure she would not be subjected to continuing assault and harassment. (*Id.*). Finally, she alleges concrete harms based on Baylor's inadequate response, including a decline in grades, avoidance of social activities on campus, avoidance of certain areas of campus, the loss of financial aid, and withdrawal from Baylor altogether. (*Id.* ¶ 75).

The Court is therefore satisfied that Plaintiff has pled sufficient facts to state a plausible claim for post-reporting sexual harassment.

## B. Heightened Risk of Sexual Harassment or Assault

Plaintiff also claims that Baylor's actual notice of the threat posed by Elliott and other student–athletes and deliberate indifference to that threat subjected her to a heightened risk of

sexual assault. Specifically, Plaintiff alleges that Baylor failed to address and actively concealed sexual violence committed by its football players for several years, (*id.* ¶ 33); that university staff were repeatedly and directly informed of sexual assaults committed by football players and neither reported the misconduct nor conducted appropriate investigations, (*id.* ¶ 52); and that those actions gave rise to an "overall perception that football was above the rules and that there was no culture of accountability for misconduct," (*id.*). With respect to her specific assailant, Plaintiff alleges that Baylor knew of at least six previous assaults committed by Elliott against female students and was aware that Elliott had been cited for misdemeanor sexual assault, but failed to take any protective action. (*Id.* ¶ 27–30).

As noted above, institutions may be held liable in damages under Title IX "where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. To be found to have been deliberately indifferent, an institution's response to the harassment—or lack thereof—must be "clearly unreasonable in light of the known circumstances." *Id.* at 648–49. An institution "may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment"; to "subject" a student to harassment, a school need only make the student vulnerable to that harassment. *Davis*, 526 U.S. at 644–45. Finally, liability is permitted only if the institution exercised "substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645.

In the instant case, Baylor argues that Plaintiff fails to state a viable claim under Title IX because Plaintiff makes allegations regarding alleged non-compliance with federal regulations and

administrative guidance. (Mot. Dismiss, Dkt. 32, at 18).[3] As the Court discussed above, although a school's failure to comply with certain DOE guidelines cannot alone demonstrate deliberate indifference, DOE regulations may still be consulted when assessing the appropriateness of a school's response to reports of sexual assault. *See supra* Section III(A).

Moreover, the Court is satisfied that Plaintiff has alleged sufficient facts to, if accepted as true, "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. Plaintiff's allegations, if assumed to be true, are more than sufficient to allow a plausible inference that Baylor was deliberately indifferent to sexual harassment—of which it had actual knowledge—that was so severe, pervasive, and objectively offensive that it could be said to deprive Plaintiff of access to the educational opportunities or benefits provided by the school. *See Davis*, 526 U.S. at 650. Baylor's alleged failure to address and active concealment of sexual violence committed by its football players, including Tevin Elliott, was a form of discrimination. Baylor's alleged knowledge of the need to supervise Elliott and protect female students plausibly constitutes deliberate indifference. Finally, Baylor's alleged deliberate indifference plausibly created an environment in which football players could sexually assault women, including Plaintiff, with impunity. That vulnerability—or heightened risk—plausibly constitutes harassment under Title IX. The Court is therefore satisfied that Plaintiff has pled sufficient facts to state a plausible claim for a heightened risk of sexual harassment and assault.[4]

---

[3] Baylor also seeks dismissal based on the statute of limitations, an argument the Court addresses in the following subsection. *See infra* Section III(B).

[4] Another avenue for Title IX claims, including those concerning heightened-risk, involves an official policy of intentional discrimination by an institution. *See Franklin*, 503 U.S. at 75 (distinguishing claims alleging "intentional discrimination" by an institution from those claims seeking to hold an institution liable for the discriminatory acts of an individual); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (distinguishing claims involving an "official policy" of discrimination from those seeking to hold an institution liable for the discriminatory acts of an individual). Because Plaintiff has plausibly alleged heightened-risk claims under the actual notice and deliberate indifference framework, the Court declines to address whether Plaintiff also plausibly alleged claims under the official policy framework.

**C. Statute of Limitations**

In addition to arguing that Plaintiff has failed to state a claim under Title IX, Baylor also argues that any such claims are barred by the statute of limitations. "A motion to dismiss may be granted on a statute of limitations defense where it is evident from the pleadings that the action is time-barred, and the pleadings fail to raise some basis for tolling." *Taylor v. Bailey Tool Mfg. Co.*, 744 F.3d 944, 946 (5th Cir. 2014). While Title IX has no express limitations period, the Fifth Circuit recently held that the two-year general personal injury limitations period set out in Section 16.003 of the Texas Civil Practice and Remedies Code applies to Title IX claims brought in Texas. *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 759–61 (5th Cir. 2015); Tex. Civ. Prac. & Rem. Code Ann. § 16.003.

"Absent tolling, the limitations period runs from the moment a plaintiff's claim 'accrues,'" and while the limitations period is borrowed from state law, "the particular accrual date of a federal cause of action is a matter of federal law." *King-White*, 803 F.3d at 762 (quoting *Frame v. City of Arlington*, 657 F.3d 215, 238 (5th Cir. 2011)). "[U]nder federal law, a claim accrues and the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Id.* (quoting *Spotts v. United States*, 613 F.3d 559, 574 (5th Cir. 2010)). "[A] plaintiff's awareness encompasses two elements: (1) [t]he existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions." *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 1995)). "'[A]wareness' [of the existence of the injury and causation] . . . does not mean actual knowledge; rather, all that must be shown is the existence of 'circumstances [that] would lead a reasonable person to investigate further.'" *Id.* (quoting *Piotrowski*, 237 F.3d at 576). Thus, for awareness of causation, a plaintiff "must have knowledge of facts that would lead a reasonable person (a) to conclude that there was a causal connection . . . or (b) to seek professional advice, and then, with that advice, to conclude that there

was a causal connection between the [defendant's acts] and injury." *Harrison v. United States*, 708 F.2d 1023, 1027 (5th Cir. 1983).

Baylor argues that Plaintiff was fully aware of her injury and Baylor's alleged inaction four years ago when, after she was sexually assaulted, she reported her sexual assault to Baylor and the school did nothing. Plaintiff argues that her claims under Title IX did not accrue until early 2016, when later investigations revealed Baylor's alleged role in her assault. She further argues that, to the extent her claims accrued earlier, they are subject to tolling or equitable estoppel under state law.

With respect to Plaintiff's pre-assault claim, the Court concludes that it is not evident from the pleadings that Plaintiff's claim is time-barred. Plaintiff was sexually assaulted by Elliott on April 15, 2012. She alleges that she "first became aware of Baylor's deliberate indifference to a known issue of sexual misconduct within its football program in May of 2016," when the Pepper Hamilton report was released. (Second Am. Compl., Dkt. 53, ¶ 84). Thus, while Plaintiff certainly knew of her injury—the sexual assault—in 2012, based on her allegations, she had no reason to know of Baylor's role in causing the assault until 2016.

Baylor argues that Plaintiff would certainly have known of its alleged involvement in her assault by the January 2014 criminal trial of Elliott, when three women in addition to Plaintiff testified that they had been assaulted by Elliott. At that point, Baylor argues, Plaintiff "had sufficient information that would have prompted a reasonable person to make inquiry." (Mot. Dismiss, Dkt. 32, at 18). That Plaintiff knew Elliott had assaulted other women,[5] however, is insufficient to demonstrate that she would have been put on notice to look into Baylor's knowledge of Elliott's history or Baylor's conduct in administering its football program prior to her assault. Plaintiff alleges that "Elliott's criminal trial did not address Baylor's knowledge of, and response to, Elliott's sexually

---

[5] The opinion from the state appellate court attached as Exhibit B to Baylor's motion to dismiss provides little information other than that three other women testified that Elliot sexually assaulted them. *See Elliot v. State of Texas*, No. 10-14-00112-CR, 2015 WL 1877052 (Tex. App.—Waco, April 23, 2015, pet. ref'd.).

violent past and the prevalence of sexual misconduct by football players." (Resp., Dkt. 37, at 19). It is thus reasonable to infer that Plaintiff's pre-assault claim did not accrue until 2016, meaning that it is not barred by the two-year statute of limitations.

Further, the cases on which Baylor relies to suggest that Plaintiff's claims accrued at or near the time of her assault are distinguishable. For example, in *King-White v. Humble Independent School District*, 803 F.3d 754 (5th Cir. 2015), the victim was repeatedly abused by her teacher, whom she lived with from the age of 16 until she graduated from high school. *Id.* at 762–63. The victim's mother repeatedly complained to the school about the relationship between the victim and the teacher, but her complaints went unheeded and the abuse continued. *Id.* The Fifth Circuit concluded that the plaintiffs' Title IX claims accrued by the time the victim turned 18 because, even though the plaintiffs (the victim and her mother) did not know until later about certain school policies and prior complaints from other parents about the teacher, they knew the teacher was employed by the school, knew of the abuse, and knew the school had failed to stop the abuse—which, at the least, would have led a reasonable person to investigate further. *Id.*

Here, however, Plaintiff was sexually assaulted by another student. Unlike the plaintiffs in *King-White*, where the abuser was a school employee, Plaintiff therefore had no reason to suspect that Baylor's alleged deliberate indifference played a role in her assault. And based on the allegations in her complaint, Plaintiff had no other reason to know or suspect that Baylor had actual knowledge of Elliott's prior sexual assaults until January 2016. In other words, it was not until January 2016 that Plaintiff first knew that, based on her allegations, Baylor could have stopped or prevented her assault. Plaintiff's pre-assault claim is therefore not time-barred.

With respect to Plaintiff's post-reporting claim, however, the reasoning from the cases cited above dictates that the claim is barred. Plaintiff knew of her post-reporting injury, including her continuing vulnerability to Elliott's presence on campus, in 2012. She also knew that Baylor had

15

failed to intervene. Further, because she notified Baylor of her assault, Plaintiff knew the university had actual knowledge of her assault and her continuing vulnerability to Elliott.

Plaintiff argues that even if her post-assault claim accrued in 2012, it should be tolled. First, Plaintiff argues that under the "fraudulent concealment" doctrine, her claims should be tolled because Baylor "actively concealed from [Plaintiff] any policy regarding Title IX, or that she had a Title IX right to be free from a sexually hostile environment." (Resp., Dkt. 37, at 18). But as Plaintiff's response itself notes, the fraudulent concealment doctrine applies "[w]hen a defendant has fraudulently concealed the facts forming the basis of the plaintiff's claims." (*Id.* at 17 (quoting *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 750 (Tex. 1999))). Plaintiff essentially alleges that Baylor failed to inform her of the law—not the facts—that formed the basis of her claim.

Second, Plaintiff argues that Baylor is equitably estopped from asserting a statute of limitations defense because the school misrepresented and concealed facts regarding its intentional violation of Title IX and its ability to respond to Plaintiff's report of her sexual assault. But like the doctrine of fraudulent concealment, equitable estoppel requires the defendant to conceal material facts to a party without knowledge of those facts. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998) ("[T]he doctrine of equitable estoppel requires: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations."). Because Plaintiff knew the facts underlying her post-reporting claim in 2012, the doctrine of equitable estoppel does not apply. Plaintiff's post-assault claim is therefore barred.

In light of the above, Baylor's Motion to Dismiss is hereby **DENIED** with respect to Plaintiff's pre-assault claim. With respect to Plaintiff's post-assault claim, the Motion is **GRANTED**.

## V. STATE LAW CLAIMS

In addition to her Title IX claims against Defendant Baylor University, Plaintiff brings claims for negligence and intentional infliction of emotional distress against all defendants. Each defendant has moved to dismiss these claims.

The Court's jurisdiction over Plaintiff's state law claims is supplemental to its federal question jurisdiction. 28 U.S.C. § 1367(a). A federal court exercising supplemental jurisdiction over state law claims must apply the substantive law of the state in which it sits. *Sommers Drug Stores Co. Employee Profit Sharing Trust*, 883 F.2d 345, 353 (5th Cir. 1989) (citing *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 (1938)). As a result, this Court must apply Texas law to the state law claims discussed herein. In resolving issues of Texas state law, federal courts look to decisions of the Texas Supreme Court. *Hux v. S. Methodist Univ.*, 819 F.3d 776, 780 (5th Cir. 2016). Applying state law, the Court will first address Plaintiff's negligence claim against each Defendant, then turn to Plaintiff's claim for intentional infliction of emotional distress.

### A. Negligence

In Texas, to prove a claim of negligence, a "plaintiff must produce evidence of a legal duty owed by the defendant to the plaintiff, a breach of that duty, and damages proximately caused by that breach." *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). Whether a legal duty exists is therefore a threshold question; if there is no duty, there can be no liability. *Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex. 1999). "[T]he existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question." *Greater Hous. Transp. Co. v. Phillips*,

801 S.W.2d 523, 525 (Tex. 1990). As a general matter, however, there is no duty to control the conduct of third persons. *See id.*

   *1. Baylor University*

Plaintiff makes two primary arguments that Baylor owed her a duty. First, she argues that Texas law permits a court to determine that Plaintiff was owed a duty based on a multi-factor duty assessment and that the Court should do so here. Second, Plaintiff argues that Baylor had a duty to train its employees who were tasked with responding to sexual assault reports. In support of these arguments, Plaintiff asserts that while courts generally conclude that a college or university has no special relationship with its students, and therefore no duty to protect them, that logic should not apply here because Baylor allegedly knew about Elliott's history of sexual assault.

Defendant Baylor University responds that Plaintiff's negligence claim should be dismissed because "it is well settled that universities do not have a legal duty to protect their students," (Mot. Dismiss, Dkt. 32, at 22), and because Title IX, a non-discrimination statute, does not establish a mandatory standard of conduct. Baylor also argues that these claims are time-barred by the statute of limitations.

"In determining whether the defendant was under a duty, [Texas courts] consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). Foreseeability is the dominant—but not the controlling— consideration, because "there must be sufficient evidence indicating that the defendant knew or should have known that harm would eventually befall a victim." *Id.* at 526. Courts across the country have determined, however, that the general foreseeability of sexual assault on campus is insufficient

to warrant negligence liability. *See Tanja H. v. Regents of the Univ. of Calif.*, 228 Cal.App.3d 434, 438–39 (1991) (reviewing cases).

Applying the multi-factor test to the facts at issue here leads the Court to conclude that Texas law may impose a duty of reasonable care on Baylor. Plaintiff alleges that Baylor knew Elliott had previously been cited for misdemeanor sexual assault and knew that six other students at Baylor had reported being sexually assaulted by Elliott. Accepting these allegations as true, a factfinder could conclude that the risk, likelihood, and foreseeability that Elliot might sexually assault another student should have been apparent to Baylor. The same factfinder could conclude that the social utility of Baylor's alleged conduct in responding to this knowledge was minimal. According to Plaintiff, Baylor refused to investigate these allegations or conducted cursory investigations. While this conduct gave Elliott the benefit of being allowed to remain at school and on the football team, any arguable social utility from his remaining in school could be outweighed by the risk and likelihood that other students might be victimized. Further, Baylor could have taken simple actions to protect students once aware of the threat posed by Elliott, such as conducting an unbiased investigation and administering an appropriate punishment aimed at deterring sexual assault.

The Court acknowledges the burden that allowing universities to face tort liability stemming from the acts of their students creates. Based on the multi-factor test established by the Texas Supreme Court, however, this burden is commensurate with "the risk, foreseeability, and likelihood of injury." If, for example, a university were to admit or recruit a student who it knew had been convicted of rape, that school might be obligated to take certain additional precautions related to that student's admission, programming, and housing.

Furthermore, here, Plaintiff has alleged more than just Baylor's prior knowledge of Elliott's alleged sexual assaults. She has further asserted that the school's active involvement in handling

19

reports of sexual assault—generally, with respect to football players, and with respect to Elliott specifically—put her at a more severe risk. The Texas Supreme Court has explained that

> While a person is generally under no legal duty to come to the aid of another in distress, he is under a duty to avoid any affirmative act which might worsen the situation. *See* W. Prosser, The Law of Torts § 56 at 343 (4th ed. 1971). One who voluntarily enters an affirmative course of action affecting the interests of another is regarded as assuming a duty to act and must do so with reasonable care.

*Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983). Specifically, Plaintiff alleges that Baylor actively concealed sexual violence by its football players and actively diverted cases from the student conduct or criminal processes. Instead, she alleges, the Baylor Athletics Department conducted its own untrained investigations that discredited complainants. Plaintiff concludes that these affirmative acts led to an "overall perception that football was above the rules," making her vulnerable to, and eventually leading to, her sexual assault.

Plaintiff seeks to analogize this case to *Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287 (Tex. 1996), and the Court finds the analogy apt. In that case, two employees at a regional Boy Scout council learned from a scoutmaster of complaints that an assistant scoutmaster, Melvin Estes, had been molesting some of the middle-school aged boys in the troop. *Id.* When the council employees questioned the scoutmaster further, he refused to tell them the names of the boys who had made the complaints and stated that the allegations came from a boy who was known to lie. *Id.* Based on that information, the council neither relayed the allegations to local law enforcement nor conducted any further investigation. *Id.* Shortly thereafter, when a church wanted to start its own troop, one of the council employees who knew of the allegations against Estes introduced Estes to the church without informing it of the allegations. *Id.* The church ultimately selected Estes as its scoutmaster, and he subsequently molested or attempted to molest one of the boys in that troop. *Id.* Estes was eventually sentenced to twenty years imprisonment for sexual abuse of a child. *Id.*

In evaluating the case, the Texas Supreme Court applied the multi-factor analysis to determine whether a duty might be imposed on the council. That analysis led the Court to conclude that the council did in fact owe a duty to the children and parents involved in the new troop. *Id.* at 290–93. The Court explained that the "affirmative act of recommending Estes as a potential scoutmaster to the church created a duty on the part of the council to use reasonable care in light of the information it had received." *Id.* at 291. In doing so, it emphasized certain factors, "including whether one party has superior knowledge of the risk or the right to control the actor whose conduct caused the harm." *Id.* Ultimately, the Court found that the council's duty was best stated by "comment e to Section 302B of the *Restatement (Second) of Torts,* which recognizes that there may be liability '[w]here the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct.'" *Id.* (citing Restatement (Second) of Torts § 302B, cmt. e, ¶ D).

Here, Baylor is alleged to have put Elliott in an environment where it knew or should have known that he was particularly likely to continue his pattern of sexual assault. Pursuant to the allegations in the complaint, this environment consisted not only of the broader campus community, but also the athletic department and, more specifically, the football team. Like the Boy Scout council in *Golden Spread*, Baylor is alleged to have had far more information about Elliott's history of sexual assault than did the Plaintiff and other students. Baylor also allegedly had some ability to control Elliott, given the authority it had over him as a student and football player. The Court therefore concludes that Plaintiff has plausibly alleged a claim for negligence against Baylor.[6]

---

[6] Because the Court concludes Plaintiff was owed a duty based on a multi-factor duty assessment, it does not address her allegation that Baylor had a duty to adequately train its employees.

### 2. *Defendants Briles and McCaw*

Plaintiff also alleges negligence claims against Defendants Briles and McCaw. In response, they argue they cannot be held liable in their individual capacity because any duty they have exists solely because of their position as Baylor agents or employees. The Court disagrees.

Under Texas law, for an employee to be liable for negligence related to actions taken within the scope of his employment, an independent duty must exist separate from any duty owed by the employer. *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). For example, "there is an independent duty the breach of which is personal negligence if a fellow employee fails to drive an automobile or other vehicle in a reasonably safe and prudent manner, causing injury to third parties or a fellow employee." *Werner v. Colwell*, 909 S.W.2d 866, 868 (Tex. 1995). If an independent duty exists, the simple fact that an employee might be doing something within the scope of his employment—such as driving—does not protect him from individual liability.

Applying the multi-factor test used by the Texas Supreme Court, this Court concludes that Plaintiff's allegations are sufficient to allege that Defendants Briles and McCaw may have had a separate and independent duty to act with reasonable care. Plaintiff alleges that Defendants Briles and McCaw (1) took affirmative acts that put her at greater risk by implementing an internal discipline system that gave Elliott and other players the perception that rules were not applicable to them, (Second Am. Compl., Dkt. 53, ¶ 52; (2) knew Elliott had previously been cited for misdemeanor sexual assault, (*id.* ¶ 30); and (3) knew of previous allegations by six other students that Elliott had sexually assaulted them, (*id.* ¶ 28). While Defendants allege that the latter two of these allegations are conclusory and implausible, the Court—in light of Plaintiff's allegations regarding the Pepper Hamilton findings of fact—disagrees.

Defendant McCaw seeks to distinguish this case from *Golden Spread Council* by arguing that the facts in that case "are much more specific and disturbing" than the allegations present here.

22

(McCaw Reply, Dkt. 72, at 5). With respect to Defendant McCaw's specificity argument, the Court notes that the *Golden Spread Council* opinion involved a motion for summary judgment, not a motion to dismiss. With respect to which case contains more disturbing facts, the Court—though it agrees with Defendant McCaw that allegations of child abuse are horrifying—cannot agree with the suggestion that the facts alleged in the instant case are not equally so. Plaintiff alleges that all Defendants knew of six sexual assaults allegedly committed by Elliott against other students, but that they—instead of informing law enforcement, conducting an unbiased investigation, or disciplining Elliott—insulated Elliott from the repercussions of his actions, leaving him free to commit additional assaults. "Disturbing" is an apt descriptor for allegations that Defendants put the interests of the football team or the reputation of the university ahead of other students' interest in not being sexually assaulted, ultimately leading to Plaintiff's own sexual assault by Elliott.

Defendant Briles, in contrast, analogizes this case to *Golden Spread Council*. He argues that he is in the same position as the council employees in that case, who knew of the alleged molestation but were not sued. (Briles Reply, Dkt. 73, at 3–4), He asserts that those employees were not sued because no liability existed for their actions. (*Id.*). First, the Court disagrees with this reasoning generally. That a party was not sued is little evidence of that party's non-liability; a plaintiff may file claims against only certain possible defendants for any number or reasons. Second, the facts of *Golden Spread Council* in fact suggest that the council employees could have been held liable for their failure to report Estes. Texas law expressly imposes a duty upon "a person having cause to believe that a child's . . . welfare has been or may be adversely affected by abuse or neglect by any person" to "immediately make a report" to the proper authorities. *See Golden Spread Council*, 926 S.W.2d at 291 (citing Tex. Fam. Code § 261.101(a)). Even though there is no statutorily-imposed duty applicable here, one may exist based on Defendant Briles and McCaw's alleged knowledge and actions. *See supra*.

23

The Court therefore concludes that Plaintiff has plausibly alleged negligence claims against Defendants Briles and McCaw.

### B. Intentional Infliction of Emotional Distress

Plaintiff also alleges a claim of intentional infliction of emotional distress ("IIED") against all Defendants. (Second Am. Compl., Dkt. 53, at 24–25). Defendants contend this claim should be dismissed because it is barred by the statute of limitations and because Plaintiff fails to state a claim for which relief can be granted. (Baylor Mot. Dismiss, Dkt. 56, at 3; Briles Mot. Dismiss, Dkt. 61, at 3; McCaw Mot. Dismiss, Dkt. 67, at 4–6, 15–17).

To establish a claim for IIED, a plaintiff must show: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Hoffmann-La Roch Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004). "Extreme and outrageous conduct is conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (citing *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993)). Furthermore, an IIED claim "is available only in those situations in which severe emotional distress is the intended consequence or primary risk of the actor's conduct." *Hairston v. Southern Methodist Univ.*, 441 S.W.3d 327 at 333 (Tex. App.—Dallas 2013, no pet.). IIED is a "gap filler" tort. *Zeltwanger*, 144 S.W.3d at 447. It applies in "those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Id.*

The Court agrees with Defendants that Plaintiff has not adequately pled a claim for IIED. With respect to Baylor, any potential IIED claim would overlap with Plaintiff's Title IX and negligence claims. And while Plaintiff has not alleged Title IX claims against Defendants Briles and McCaw, she has alleged negligence claims against those defendants. Given the Court's conclusion

that Texas law imposed a duty on Briles and McCaw, Plaintiff's negligence claims fill any "gap" that would be covered by the tort of IIED. (*See, e.g.*, Resp. Briles Mot. Dismiss, Dkt. 70, at 20 ("If this Court finds that Briles owed a duty to [Plaintiff], there would be no gap to fill, and IIED would not be an appropriate theory of liability"). Plaintiff's IIED claims against are therefore **DISMISSED**.

### C. Statute of Limitations

As discussed above, Texas applies a two-year statute of limitations to personal injury claims. Tex. Civ. Prac. & Rem. Code § 16.003(a). Plaintiff asserts, however, that the statute of limitations applicable to her negligence claims is five-years because Texas uses a five-year statute of limitations for personal injury claims in which the injury arises as a result of sexual assault or aggravated sexual assault. Tex. Civ. Prac. & Rem. Code § 16.0045(b); (Resp., Dkt. 70, at 8). The Court agrees that the five-year statute of limitations applies to Plaintiff's negligence claims and that those claims are therefore not barred.

Defendants acknowledge that the five-year rule has been applied to claims against non-perpetrators, but urge that those cases "have involved perpetrators that actually were employed by the institution." (Resp., Dkt. 32, at 22). Because Elliott was not an employee of Defendants, they argue, Plaintiff's claims are subject to the two-year statute of limitations and thereby time-barred. (*Id.*). While Defendants are correct to note that most of the state court applications of the five-year statute of limitations involve perpetrators employed by the institution, they fail to identify any section of those opinions that suggest the distinction between an assailant's status as an employee is relevant. Indeed, the Court is not convinced that it is. *See Doe v. Roman Catholic Archdiocese of Galveston-Houston ex rel. Dinardo*, 362 S.W.3d 803, 809-810 (Tex.App.— Houston [14th Dist.] 2012, no pet.); *Doe v. Catholic Diocese of El Paso*, 362 S.W.3d 707, 717 n.8 (Tex.App.—El Paso 2011, no pet.); *Stephanie M. v. Coptic Orthodox Patriarchate Diocese of the Southern United States*, 362 S.W.3d 656, 659 (Tex.App.—Houston [14th Dist.] 2011, pet. denied) (refuting a defendant's argument that the five-

year statute of limitations applies only to suits against the person whose conduct violates the Penal Code); *see also C.R. v. Am. Inst. Foreign Study, Inc.*, No. 5:12-CA-1046, 2013 WL 5157699, at *7–8 (W.D. Tex. Sept. 12, 2013). Rather, the issue appears to be whether the Defendant had a legal duty to the Plaintiff. Baylor implicitly acknowledges this by arguing that "the existence of a legal duty is a relevant consideration" in determining whether the five-year statute of limitations applies. (Reply, Dkt. 44, at 10).

Defendants urge the Court to consider *Doe v. Linam*, 225 F. Supp. 2d 731 (S.D. Tex. 2002), and *Twist v. Lara*, 2007 WL 2088363 (S.D. Tex. 2007), which apply the two-year statute of limitations to assault victims' negligence and IIED claims. *Linam*, however, was decided in 2002. It thus predates the series of state court cases detailed above, which determined that the five-year statute of limitations should apply. Similarly, *Twist* was decided in 2007— at least four years before the state court decisions previously described. And while Defendants cite to a 2010 Fifth Circuit opinion applying the two-year statute of limitations to a negligence claim involving a teacher's alleged sexual abuse of several students,[7] state intermediate courts' decisions—especially those that post-date opinions from federal courts—are typically the "strongest indicator of what a state supreme court would do." *Hux*, 819 F.3d 776, 780–81 (5th Cir. 2016).

Finally, Baylor argues that Hernandez's post-assault claim is subject to the two-year statute of limitations because that claim "do[es] not involve assaultive conduct." (Mot. Dismiss, Dkt. 32, at 22). "Irrespective of whether Baylor may be held liable for Elliott's assault," the university asserts, "Plaintiff also asserts a claim for damages based on [post-assault breaches]" that are not subject to the five-year statute of limitations. (Baylor Reply, Dkt. 44, at 11). The Court finds this argument unpersuasive for two reasons. First, it inappropriately imports Title IX's pre- and post-assault

---

[7] *Doe v. St. Stephen's Episcopal Sch.*, 382 Fed. App'x. 386, 388 (5th Cir. 2010) (per curiam) (in a suit against a school involving a teacher-employee's alleged sexual abuse, applying—without explanation—the five-year statute of limitations to a vicarious liability claim but the two-year statute of limitations to a negligence claim).

division into Plaintiff's negligence claim, which alleges a variety of breaches and a variety of resulting injuries. (*See* Second Am. Compl., Dkt. 53, ¶¶ 86–96). Second, it circumscribes the reach of Section 16.0045 beyond the language of that statute. Section 16.0045, by its plain language, applies to any injury that "arises as a result" of sexual assault. Tex. Civ. Prac. & Rem. Code § 16.0045(b).

The Court therefore concludes that the five-year statute of limitations applies to Plaintiff's state-law claims. Those claims accrued, at the absolute earliest, when Plaintiff enrolled in Baylor in the fall of 2011. Because her suit was filed in March 2016, her claims are not time-barred.[8] With respect to Plaintiff's negligence claims, Defendants' Motions to Dismiss are therefore **DENIED**.

### V. CONCLUSION

For the foregoing reasons, the court hereby **ORDERS** that Defendants' motions to dismiss, (Dkts. 56, 61, 67) are **GRANTED IN PART** and **DENIED IN PART**, consistent with the terms of this Order. Specifically:

- With respect to Plaintiff's post-reporting claims, Baylor's Motion to Dismiss is **GRANTED**.

- With respect to Plaintiff's heightened-risk claims, Baylor's Motion to Dismiss is **DENIED**.

- With respect to Plaintiff's negligence claims, the Motions are **DENIED**.

- With respect to Plaintiff's intentional infliction of emotional distress claims, the Motions are **GRANTED**.

**SIGNED** on April 7, 2017.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

---

[8] Because the Court concludes that the five-year statute of limitations applies to Plaintiff's state law claims and that those claims are therefore viable, it does not address whether the claims would still be viable under the two-year statute of limitations. The Court notes, however, that much of the accrual and tolling analysis in the section of this Order addressing Title IX would also be applicable to Plaintiff's state-law claims.